G4decapc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,                    New York, N.Y.

                v.                           15 CR 607(WHP)

JAMES CAPERS, et. al.,

                Defendants.
------------------------------x

                                             April 13, 2016
                                             2:12 p.m.


Before:
                    HON. WILLIAM H. PAULEY III,
                                             District Judge

                         APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  JESSICA LONERGAN
     Assistant United States Attorney

ANDREW G. PATEL
     Attorney for Defendant James Capers

NATALI J.H. TODD
     Attorney for Defendant Tommy Brown

SARAH KUNSTLER
     Attorney for Defendant Marquise Rochester

KELLEY SHARKEY
     Attorney for Defendant Christian McKnight
BY:  EDWARD WALDREN

DAVID TOUGER
     Attorney for Defendant Unique Christopher

THOMAS F.X. DUNN
     Attorney for Defendant Dante Rodgers

JEFFREY G. PITTELL
     Attorney for Defendant
BY:  ANDREW G. PATEL

G4decapc

```
1              (In open court)

2              THE DEPUTY CLERK:  United States v. Capers.

3    Appearances by the government, please.

4              MS. LONERGAN:  For the government, Jessica Lonergan.

5    With me at counsel table is United States Pretrial Services

6    Officer Carlos Ramirez, who's here to address something with

7    regard to one defendant, perhaps at the end of the proceeding.

8              THE COURT:  Very well.  Good afternoon both of you.

9              THE DEPUTY CLERK:  Counsel for the defendants?

10             MR. PATEL:  Good afternoon, your Honor.  Andrew Patel

11   for Mr. James Capers, who's in the blue.

12             THE COURT:  Good afternoon to you, Mr. Patel.

13             And I note the presence of Mr. Capers in the jury box.

14             MS. TODD:  Good afternoon, your Honor.  Natali Todd

15   for Tommy Brown, who's seated in the front row to the Court's

16   right in the gray T-shirt.

17             THE COURT:  Very well.  Good afternoon, Ms. Todd.

18             I note Mr. Brown's presence.

19             MS. KUNSTLER:  Good afternoon, your Honor.  Sarah

20   Kunstler.  And I am here for Marquise Rochester, who is on the

21   end here in the brown.

22             THE COURT:  Good afternoon to you, Ms. Kunstler.

23             I note Mr. Rochester's presence.

24             MR. PATEL:  Your Honor, I am Andrew Patel standing in

25   for Jeffrey Pittell, P-I-T-T-E-L-L, for Mr. Edwin Moye, who's
```

G4decapc

 1    in the front row, with consent of both Mr. Moye and Mr. Capers.

 2            THE COURT:  Mr. Moye, do you consent to having

 3    Mr. Andrew Patel stand in for your attorney, Mr. Jeffrey

 4    Pittell, today in this proceeding?

 5            DEFENDANT MOYE:  Yes.

 6            THE COURT:  Very well.  Thank you.

 7            MR. WALDREN:  Good afternoon, your Honor.  Edwin

 8    Waldren for Christopher McKnight in place of Kelley Sharkey.

 9    He's seated in the front row in the cream-colored shirt.

10            THE COURT:  Good afternoon to you, Mr. Waldren.

11            And I note Mr. McKnight's presence.

12            MR. TOUGER:  Good afternoon, your Honor.  David Touger

13    for Mr. Unique Christopher, who's in the front row.

14            THE COURT:  Good afternoon, Mr. Touger.

15            And I note the presence of Mr. Christopher.

16            MR. DUNN:  Good afternoon, your Honor.  Thomas Dunn

17    for Dante Rodgers.  And Mr. Rodgers is directly in front of me

18    in the first row.

19            THE COURT:  Good afternoon to you, Mr. Dunn.

20            And I see Mr. Rodgers in the front row.

21            MS. GREENWOOD:  Excuse me, your Honor.  Emma

22    Greenwood, the discovery coordinator.

23            THE COURT:  Good afternoon, Ms. Greenwood.

24            Ms. Lonergan, what's the status of this matter?

25            MS. LONERGAN:  Yes, your Honor.  Since the last

G4decapc

| | |
|---|---|
| 1 | conference we have obtained additional discovery, which we have |
| 2 | produced to Ms. Greenwood.  I believe, although maybe she could |
| 3 | speak to it, that she has produced that to defense counsel, at |
| 4 | least some of it.  And then my office is the IT department.  We |
| 5 | have a number of drives that go to the jail.  And they are |
| 6 | currently loading all the discovery on to the drive to go to |
| 7 | the jail.  And I anticipate that we will be able to get those |
| 8 | out to the jail this week. |
| 9 | We do multiple copies to the jail so that there's |
| 10 | enough for all of the defendants to review.  So it just takes |
| 11 | some time for our IT department to put all the discovery on to |
| 12 | the drives. |
| 13 | The reason this wasn't produced earlier is just it |
| 14 | wasn't in our possession. |
| 15 | THE COURT:  And what's the volume of this discovery? |
| 16 | And where did it come from? |
| 17 | MS. LONERGAN:  So, your Honor, as we continue to |
| 18 | investigate, we get more things.  For example, we've gotten |
| 19 | additional jail calls that we've subpoenaed either from |
| 20 | additional facilities and also from the federal facilities. |
| 21 | Now that they've been incarcerated in the federal facilities, |
| 22 | we got the federal jail calls.  So that's one of the things |
| 23 | we've turned over. |
| 24 | In addition, we got from the Bronx District Attorney's |
| 25 | Office, they had done a long wiretap investigation, which we |

G4decapc

1    just recently obtained from them.  It was about a year-long

2    wiretap investigation.  It did not actually really focus on

3    these individuals.  However, the Bronx District Attorney's

4    Office also sent with that a spreadsheet in which they listed

5    everybody that they believed had been intercepted on their long

6    wiretap investigation.  One of the defendants' nicknames was on

7    that spreadsheet.  I don't know, because if it's the same

8    person, but in the excess of caution, we have turned over that

9    long wiretap and told defense counsel who we believe could be

10   intercepted on that; again, which I believe is only one

11   defendant in this case.

12           And I believe that is the bulk -- again, for example,

13   as we continue to investigate, we do cell site applications.

14   We turn over the cell site applications.  When we get the data

15   back from the telephone companies, we turn that over.  Again,

16   without making -- I can't, of course -- as the investigation

17   goes on, things come up.

18           But it's my understanding at this point that I think

19   with the exception of if we continue to subpoena jail calls,

20   that this would be the last large production.  Again, as we do

21   things like cell site orders or we get telephone records, those

22   are things that we would turn over to defense counsel.  But

23   that should take less time for them to review than what's been

24   produced to date.

25           THE COURT:  How many calls approximately were

G4decapc

```
 1    intercepted in the Bronx, year-long wiretap?

 2              MS. LONERGAN:  Thousands.  But again, your Honor, that

 3    was really a case of a gang that primarily -- with respect to

 4    the federal cases, the defendants who were more intercepted on

 5    that were defendants in the companion case, the Taylor case.

 6    And again, from my review of the materials, I think that, at

 7    most, one of these defendants was intercepted, and that that

 8    case was not -- I'm not even sure if those are things that we

 9    would at this point seek to introduce.  But, again, as soon as

10    we obtained it, we reviewed it and turned it over.

11              THE COURT:  But if there's nothing that relates to

12    these defendants, you're not going to be offering it, are you?

13              MS. LONERGAN:  If it doesn't relate to these

14    defendants, no, of course not.  We would not be offering it.

15    But, again, I don't want to hold something which will take us

16    some time to go through thoroughly and not give it to defense

17    counsel, because I don't want to hold up their possibility of

18    looking at it.

19              And again, from our preliminary review -- and again, I

20    stress preliminary, because I didn't want it to sit in my

21    office for a long time before turning it over to defense

22    counsel.  We reviewed it, all of the applications of the many

23    reups, as well as that spreadsheet, and the only name I saw

24    that I thought related to these defendants was one nickname.

25    And so we told defense counsel that, so to give them a little
```

7

G4decapc

 1   bit of guidance with respect to going through those wires.

 2             THE COURT:  But you haven't confirmed whether that

 3   nickname is actually the individual who's a defendant in this

 4   case, right?

 5             MS. LONERGAN:  That's correct, your Honor.

 6             THE COURT:  What would be so hard about finding that

 7   out?

 8             MS. LONERGAN:  Your Honor, it's honestly just

 9   finding -- so what I have right now is I have the Bronx

10   District Attorney's Office's applications.  So I have to go

11   look through or get -- ask law enforcement to look through

12   thousands of calls, find the one with the number associated

13   with that and then listen to it and hope that they can

14   potentially recognize the defendant's voice or not.  I mean,

15   that will be done.  Clearly we will tell defense counsel once

16   we've confirmed one way or the other.

17             THE COURT:  Mr. Patel?

18             MR. PATEL:  Your Honor, my understanding from

19   Ms. Greenwood's office is that we're talking about 68,000 phone

20   calls from 39 separate cell phones.  Your Honor, my concern is

21   an individual who may have been intercepted may have standing

22   to object to the search or the interception.  But who was

23   intercepted does not tell us who was discussed.

24             So there very well may be information -- and I have

25   used this to my clients' advantage in other matters, where

G4decapc

 1   person A is talking to person B and says something that's very

 2   helpful about my client.  Sometimes they say things that's not

 3   so helpful.  But that's not going to show up on a spreadsheet

 4   of who was speaking, unless someone actually goes through and

 5   finds out by what name or nickname was actually being

 6   discussed.  We're talking about an amount of work here.

 7          Essentially there were two indictments that were filed

 8   simultaneously in the Southern District of supposedly,

 9   according to the government, sort of two warring factions.  And

10   so there may well be discussions in that wiretap on the other

11   group about people in this group.  And we won't know until we

12   listen.

13          THE COURT:  When did you get the material?

14          MS. LONERGAN:  From the Bronx District Attorney's

15   Office?  Within the last few weeks, your Honor.

16          MS. GREENWOOD:  Your Honor, just to clarify --

17          THE COURT:  Step up to the podium, Ms. Greenwood.

18          MS. GREENWOOD:  Your Honor, to clarify what defense

19   counsel have received since the last status conference, my

20   office has received two global productions, being the fifth and

21   sixth productions respectively.  All defense counsel have

22   received the fifth production.  My office received the sixth

23   production on April 11th, just a couple of days ago.

24          We're still processing the material.  So defense

25   counsel have not actually seen the sixth production.

G4decapc

1              The sixth production includes over 1,000 prison calls,

2     which I relayed to counsel.  There was a cover letter that the

3     government provided to me along with that production.  I shared

4     that cover letter with defense counsel.  But to date, counsel

5     do not have those materials.  I expect to be able to turn those

6     over to defense counsel by the end of this week.

7              And I should also mention that the fifth production,

8     which has been the topic of discussion so far today, included

9     about as much discovery volume wise as had been produced

10    before.  So it basically doubled the discovery in this case.

11             So the fifth production was distributed to counsel on

12    March 25th.  So defense counsel have had since March 25th to

13    review approximately 67 gigabytes of data.

14             And I should also mention that the sixth production,

15    which volume-wise is only 2.8 gigabytes -- relatively small

16    compared to the previous production -- is quite complex, which

17    I also relayed to counsel this afternoon as we had a chance to

18    review it.  As I mentioned, there are the 1,000 prison calls.

19    There is also some other audio files that require a proprietary

20    player to play.  So there's a little bit of learning curve, I

21    should say, to be able to listen to those calls, which we will

22    be helping defense counsel with.

23             THE COURT:  Do you have that proprietary software in

24    place or not?

25             MS. GREENWOOD:  Yes.  The player was provided, as it

G4decapc

1    often is, by the government.  What I meant was that my office

2    will be helping defense counsel if they're unfamiliar with how

3    to use it.  Sometimes these players can be particularly

4    difficult to figure out how to work.

5            THE COURT:  All right.  Anything else?

6            MS. GREENWOOD:  That's all, your Honor.

7            THE COURT:  Thank you.

8            So, Mr. Patel, what do you want to do?  Sounds like

9    you better get really busy, because I'm telling you right now,

10   I'm not moving the trial date.  Because the government, they'll

11   be collecting things forever.

12           MR. PATEL:  That's true, your Honor.  But we need the

13   opportunity to review it.

14           THE COURT:  Discovery was complete on January 29th,

15   right?

16           MR. PATEL:  No.

17           THE COURT:  And now they've come up with more?

18           MR. PATEL:  Twice as much as they had before.  I mean,

19   your Honor, it's like we're -- we can't be held as a moving

20   target that we have no control over.  We're running as fast as

21   we can, but the base gets moved.

22           THE COURT:  What do you want to do?  I have five

23   defendants who are in custody.

24           MR. PATEL:  And I think, your Honor, that we are in a

25   position that we can at least take some preliminary steps

G4decapc

1    towards moving the case forward and getting things ready.

2    Ms. Sharkey wrote a letter to your Honor asking for a motion

3    schedule.  She is currently on trial in what I understand to be

4    an authorized capital case in New Jersey.  And she requested

5    eight to ten weeks to file motions.  I would join that request.

6              THE COURT:  What motions are you going to file?

7              MR. PATEL:  Your Honor, I've spoken with counsel for

8    Mr. Moye.  He will be filing a motion challenging the Facebook

9    and Instagram search warrants.  We will be filing similar

10   motions.  I've been having discussions with the government

11   about whether there will be identification motions and standard

12   suppression motions.  Those discussions are ongoing, and I hope

13   that by that period of time we'll have an answer as to whether

14   or not the government will seek to introduce anything that was

15   actually taken from Mr. Capers.

16             THE COURT:  Who else has motions that they want to

17   file?

18             Don't all sit there.

19             MR. WALDREN:  Your Honor.

20             THE COURT:  Otherwise, I'll assume you have no

21   motions.  We'll just go.

22             MR. WALDREN:  Your Honor, Ms. Sharkey anticipates

23   she's going to file motions to suppress statements, as well as

24   physical evidence.

25             MR. DUNN:  I have no motions, your Honor.

G4decapc

1          THE COURT:  Mr. Touger?

2          MR. TOUGER:  I have no motions either.

3          MS. TODD:  On behalf of Mr. Brown, I have no motions.

4          MS. KUNSTLER:  Your Honor, based on the evidence I've

5     reviewed so far, I have no motions.

6          MR. TOUGER:  I should probably qualify remarks to that

7     one.  Based on what we have so far, I have no motions.

8          MS. KUNSTLER:  I have not been able to -- the fifth

9     and sixth productions I have not reviewed.  I started to open

10    all the files, or see if I could open all the files, on the

11    fifth production.  I have done no substantive review of that

12    discovery yet.

13         THE COURT:  Well, I don't know how long you think that

14    I'm going to wait for you to decide whether you can do

15    something more than just open the files.

16         MS. KUNSTLER:  It took me a day -- actually took me

17    the better part of a day and a half to make sure I could open

18    all the files, because it is quite a lot of material.  It's not

19    just opening a folder.  It's making sure that you don't have to

20    then request new discovery, new productions of material.

21         THE COURT:  So it took you a day and a half just to

22    make sure you could open the files, but you haven't looked at

23    them?

24         MS. KUNSTLER:  I have started --

25         THE COURT:  Why don't you listen to what you're

G4decapc

1    saying, because it sounds idiotic to me.  We're trying this

2    case on November 28th.  So get with the program.

3                MS. KUNSTLER:  Your Honor, it is --

4                THE COURT:  You've got a discovery coordinator.  She's

5    available all the time.

6                MS. KUNSTLER:  Two weeks ago we got 67 gigabytes of

7    material.  Each of those gigabytes is the equivalent, I think,

8    of over 30,000 file boxes of information.  So I have begun to

9    review this material, but it is quite a lot of material.

10   Making sure that we can open it, that our clients can open it

11   so they can review it with us, so it is in a format that we can

12   all review and that it is intelligible.  It's important, as is

13   reviewing, but it is a great amount of --

14               THE COURT:  Right.  And it will be even a bigger chore

15   when you start to look at it.

16               I'm fixing a motion schedule in the case.  The

17   defendants can file their motions on June 15th.  The government

18   can respond by July 1.  I'll take replies on July 12.  And I'm

19   going to set the matter down for any suppression hearing on

20   July 18th at 10:00.

21               Any other issues relating to discovery?

22               MS. LONERGAN:  Not from the government, your Honor.

23               THE COURT:  If the government winds up discovering any

24   other amounts of material, I want a letter from the government

25   alerting the Court to it, with an explanation as to what is

G4decapc

 1    going on.

 2              MS. LONERGAN:  Of course, your Honor.

 3              THE COURT:  What are the defendants' respective views

 4    concerning the exclusion of time between now and July 18th?

 5              MR. PATEL:  No objection.

 6              MS. TODD:  No objection, your Honor.

 7              MS. KUNSTLER:  No objection.

 8              MR. WALDREN:  No objection.

 9              MR. TOUGER:  No objection.

10              MR. DUNN:  On behalf of Mr. Rodgers, your Honor, no

11    objection.

12              THE COURT:  All right.  Since this continuance is due

13    to the government's continuing production of voluminous

14    discovery, the defendants' need to review the discovery, to

15    learn how to open the discovery and to make motions, I

16    prospectively exclude the time from now until July 18, 2016,

17    from Speedy Trial Act calculations.  I find that this

18    continuance serves to ensure the effective assistance of

19    counsel and prevents any miscarriage of justice.  Additionally,

20    I find that the ends of justice served by such a continuance

21    outweigh the best interests of the public and each of the

22    defendants in a speedy trial, pursuant to 18, U.S.C., Section

23    3161.

24              And I'm going to end this conference and turn to the

25    other matters with the individual defendants in a moment, but

G4decapc

1   I'm going to end it the way I started it.  We have a firm trial

2   date in this case.  We're going forward on that day.  And if

3   you've only opened the government's discovery and you haven't

4   looked at it, it's fine.  We're going to go forward with trial.

5   We'll see who blinks first.

6           Anything further from the government?

7           MS. LONERGAN:  Not with respect to the overall case,

8   your Honor.

9           THE COURT:  All right.  At this juncture we have

10  issues with two defendants.  I think that I'll take up the

11  matter relating to Unique Christopher last.

12          With respect to the defendant who was in custody,

13  Ms. Todd, did you want to be heard?

14          MS. TODD:  Yes, your Honor.  Thank you.

15          Your Honor, I submitted a letter to the Court

16  regarding Mr. Brown's medical issue, asking the Court to

17  consider releasing him on bail, specifically so he could be

18  attended to; because it is Mr. Brown's belief, as well as mine,

19  having reviewed his medical records, that he's not receiving

20  the appropriate treatment.  And so the application to the Court

21  this afternoon is primarily based on the need for medical

22  treatment.

23          As the Court is aware by my submission, Mr. Brown was

24  shot a few weeks before his incarceration.  That was on

25  August 21st of 2015, when he was shot in the back at very close

G4decapc

1   range.  It is my understanding from Mr. Brown and from the

2   review of the medical records that the bullet is still lodged

3   in his chest area.  From speaking with his mother, who is

4   seated in the audience, and also his father, who is present,

5   and Mr. Brown himself, it was their understanding from the

6   doctor at Jacobi Medical Hospital at the time that after the

7   wound had been sufficiently healed, that they would attempt to

8   remove the bullet.  But as the Court is aware, he was arrested

9   in state court and then immediately, within two or three days,

10  transferred to MDC, where he has been incarcerated since the

11  inception of this case.

12         Mr. Brown has constant pain.  He coughs up blood more

13  often than not.  Although he has seen doctors, it is my

14  understanding from the records and from speaking to Mr. Brown

15  that it is not the intention of the medical staff at the Bureau

16  of Prisons to remove the bullet.  The family wants it out.  He

17  wants it out, because he has difficulty breathing on a daily

18  basis, where he expresses that he constantly is gasping for

19  breath.  Even during a normal conversation it's intermittent.

20  And it comes and goes.

21         Judge, I understand that he is charged with what I

22  consider to be relatively serious crimes.  He's charged in

23  Count One of the racketeering conspiracy and Count Three, which

24  is the narcotics conspiracy, where he faces, if he were to be

25  convicted, substantial period of time in jail.  However, it is

G4decapc

1    a rebuttable presumption.  And we believe under the statute the

2    exception in considering his medical records is substantial

3    enough for the Court to consider releasing him.

4         We're not asking that he simply be released, but under

5    the strictest of release conditions, including home confinement

6    with electronic monitoring, and that he's only allowed to go to

7    the doctor, and all the necessities as pretrial services see

8    fit.

9         He is not a flight risk.  He has lived in the

10    community all his life.  His mother is here.  There are two

11    people who would be willing to sign, should the Court consider

12    releasing him.

13         I understand the government objects.

14         And so, Judge, based on all of the information that I

15    have provided to the Court, including some pages relevant to

16    his medical records, we're asking the Court to consider

17    releasing him for the purpose of getting treatment.

18         THE COURT:  Thank you, Ms. Todd.

19         Ms. Lonergan?

20         MS. LONERGAN:  Yes, your Honor.

21         Having spoken, or one of my colleagues having spoken

22    to the Bureau of Prisons, their medical staff does not believe

23    that it is necessary to remove the bullet.  I'm not qualified

24    to make a determination one way or the other.

25         Nevertheless, should the bullet need to be removed, my

G4decapc

1    understanding is that the BOP has the capacity to do that;

2    perhaps not at MDC, but that there are BOP medical facilities.

3              So it seems to me that in the first instance, if

4    Ms. Todd wants to address this with BOP and see if she can talk

5    to the BOP doctors and ask them to change their minds about

6    removing the bullet, but to do that within -- then to figure

7    out, which I believe is true, whether or not it can be done

8    within the BOP facility, because --

9              THE COURT:  The BOP advised me back on March 23 that

10   the defendant was going to have a chest CT exam.  Did that

11   happen?

12             MS. LONERGAN:  Your Honor, I'm not aware of whether or

13   not that happened.

14             THE COURT:  Ms. Todd, did that happen?

15             MS. TODD:  Yes, it did, your Honor.  And the Bureau of

16   Prisons' position is still the same as it was several months

17   ago:  That they don't feel the need to remove the bullet.

18             THE COURT:  Well, I'm going to direct the government

19   to obtain a further report from the physicians at MDC regarding

20   Mr. Brown's condition, in view of their earlier representation

21   that once the results of the chest CT were available, Mr. Brown

22   would be sent to an outside consultant to make a determination

23   as to the appropriate treatment.

24             Do you know whether that happened, Ms. Todd?

25             MS. TODD:  No, your Honor, I'm not aware.  All I'm

G4decapc

1     aware is that he was sent to get a chest exam.  And the

2     determination was the bullet is where it is, and they don't

3     feel the need to remove it.  But nothing further.

4                 THE COURT:  I'm going to direct the government to make

5     that inquiry and submit a letter to me by next Monday.

6                 MS. LONERGAN:  Yes, your Honor.

7                 THE COURT:  With a full report from the doctors and

8     the outside consultant, if he has been seen by one.

9                 So for now, the application to release the defendant

10    on some conditions is denied.

11                Turning to Christopher Unique, who wants to be heard?

12                MR. TOUGER:  It's the government's application.

13                MS. LONERGAN:  Yes, your Honor.

14                At this point I've spoken about the matter with

15    Pretrial Services Officer Ramirez.  And if you'd like to hear

16    further from him, that's why he's here.

17                But based on the state arrest, which was for being in

18    possession of a knife -- and we understand, we know the state

19    court complaint was dismissed.  But, nevertheless, that and the

20    defendant's continued use of marijuana, while not in itself

21    serious, nevertheless shows that he is not taking the

22    conditions of release seriously.

23                The government, however, is not seeking remand at this

24    time, because the government thinks that there is something

25    that is somewhat less restrictive that will adequately meet the

G4decapc

1  requirements of the statute.  Having spoken with Officer

2  Ramirez, the government thinks that home detention with

3  electronic monitoring would be appropriate in this case, in

4  which the defendant would be at home, except for approved times

5  when he was allowed to be out of the home; for example, that

6  would be if he has a job; if he's -- education; to meet with

7  his lawyer; if he goes to religious services; things of that

8  nature.

9          What that would do, in the government's hope, is, for

10  example, to keep him from the kind of environments in which he

11  might think that it was good or important for his safety for

12  him to hold on to a knife or other weapons.  Because my

13  understanding is that is what his explanation was to the NYPD,

14  is that he was carrying a knife for his safety.  But if he's

15  not out at night unless approved -- the government does not

16  wish to keep him from working or doing something else

17  productive, but we think this would adequately balance the need

18  for safety of the community, as well as to keep the defendant

19  doing the positive things that he has been doing while on

20  pretrial release.

21          THE COURT:  Mr. Touger?

22          MR. TOUGER:  Your Honor, the government overstates the

23  situation immensely.  First of all, the continued use of

24  marijuana.

25          He has tested negative for marijuana use since

G4decapc

January.  So there's no continued use of marijuana.  For three

months he's been perfectly clear from any marijuana use.  And

prior to that, he did test positive on two occasions that

occurred back -- one in November, which was within two months

of his arrest, so that positive could have been from use prior

to his arrest; although it also could have been use after.  We

don't know.  And one later on, which was obviously a positive

result.

He's been performing very well at the Getting

Out/Staying Out program he's involved in.  Mr. Ramirez, who's a

seasoned pretrial officer, has told me he's not seeking any

changes whatsoever.  This is purely the government's motion,

not Mr. Ramirez' motion.

He has never been arrested before.  He has no criminal

record.  He's doing exactly everything the Court has told him

to do for the last three months.  He did get arrested, but that

case was dismissed.

The failure to report, your Honor, is partly my fault,

I must admit.  Because when he called me about it, I thought he

said that he was taken to the precinct and dismissed at

that point.  So I didn't think he was charged with anything.

So I did not think it was as big a deal as it was.  As it

turned out, I had misheard what Mr. Christopher told me.  So

that's why there was some miscommunication with him

communicating that to his pretrial officer.  So I take some of

22

G4decapc

1    the blame for that.

2         I don't think this change will serve any purpose

3    except costing taxpayer money for no reason whatsoever.

4    Mr. Christopher is doing everything the Court has asked him to

5    do.

6         THE COURT:  Is he employed?

7         MR. TOUGER:  He's working through this Getting

8    Out/Staying Out program, which I think you have a letter --

9         THE COURT:  I do.

10        MR. TOUGER:   -- before you.  In the letter it says

11   Mr. Unique, to me, is always easygoing, kind, hardworking and

12   calm.  It's been wonderful working with Mr. Unique.

13        I mean, this is a glowing letter, your Honor.  I don't

14   see any need for a change, except for the clarification that

15   he's back living with his mother now, as opposed to living with

16   his grandmother, because his grandmother took very ill.  And he

17   had to move back to his mother's apartment.

18        THE COURT:  Is he employed?

19        OFFICER:  Your Honor, can I respond?

20        THE COURT:  Yes.  I want to hear from you, Officer

21   Ramirez.

22        OFFICER:  Thank you, your Honor.

23        I just want to point out to the Court that actually

24   there are a few changes that I want to clarify.  The memo that

25   was sent to your Honor dated April 1st, it actually says that

G4decapc

1    he was arrested on September 3rd.  It's the 8th of September.

2            There was a prior memo sent to your Honor, and I think

3    cc'ed to everybody else, indicating that there were two

4    positives back in the day, a few months back.  One of them

5    actually came back, confirmed negative.  And I had discussed

6    that with Mr. Christopher.

7            The case initially belonged to Officer Cudina, who was

8    very helpful in getting him into both Focus Forward, which your

9    Honor is aware of that program, and Getting Out and Staying

10   Out.  When she left to probation, I took over the case.  And I

11   realized that he was playing games with these positives,

12   whereby it was my opinion, based as the drug specialist for

13   pretrial services working there 25 years, what he was doing was

14   using a little bit of marijuana and flushing his system so that

15   he would get a negative on a confirmation.

16           I confronted him about this, actually right on the

17   same day he was going to Focus Forward graduation, and told

18   him, the nonsense stops now.  I'm supervising you, not

19   Ms. Cudina.  I know what you're doing.  It stops.

20           Well, sure enough, shortly after that, his last

21   positive for use was January 12th.  So there are two true

22   positives that we can say he's confirmed positive for using.

23   Since then, he was negative seven times for marijuana.  We put

24   him on a random drug testing program.

25           There are complications.  I'm stuck between a rock and

G4decapc

1   a hard place, because I do agree with what the government's

2   saying and I do agree with defense counsel.  That's why I'm

3   here before your Honor to express my opinion on what's going

4   on, and hopefully your Honor can decide.

5          The defendant was living with his grandmother and

6   aunt.  And the Court had modified his bail conditions because

7   apparently living with his mother, from what I understand, was

8   not a good thing.  She apparently has a prior history of using

9   drugs, if not even a present history of using drugs.  However,

10  he recently was told to remove himself from his grandmother's

11  apartment by his aunt.  His grandmother became ill and has now,

12  from my understanding, she's in some kind of rehab facility in

13  the Bronx.

14         The aunt now basically took over and told him to get

15  out.  He had nowhere to live, so he's living with his mother.

16  I'm not crazy about him living with his mother, but he's got a

17  roof over his head and somewhere to sleep.  I visited the home.

18  I didn't see anything particularly bad, but I wasn't crazy

19  about the fact that his mother looks like she is still using

20  drugs.

21         When the defendant came in in March, on the 2nd, which

22  I don't have here, he tested positive for opiates.  The

23  confirmation came back negative.  When I confronted him about

24  this opiate use, he told me his mother had given him Xanax,

25  which is an antidepressant, antianxiety medication, a

G4decapc

benzodiazepine, not an opiate.  So when it came back negative,
I couldn't hold that against him, but I warned him, no more
pills from mom, okay?  Stay on the straight and narrow.

He's been working as a maintenance employee at Getting
Out recently.  And he does supply me with pay stubs.  So he's
working.  He's attending this program called Getting Out and
Staying Out.  They also call it GOSO for short.  He's reporting
to me.  He's testing negative.  He's living with his mother,
which I'm not crazy about, but he's got somewhere to live.
He's not using marijuana, as far as I know.

But then he gets arrested, as your Honor is aware.
And that's why we memo'd the Court in March.  He got arrested
for a knife.  He told me he had it because he was using it for
his protection.  What is disturbing as well was he was arrested
about 12:00 at night.  So this was around midnight, little
bit -- shortly after midnight.  Why he's in a cab, in his own
words, at midnight getting arrested for possessing a knife is
bothering.  Troublesome.

So when the government informed me of the arrest --
and we got the notice right afterwards.  It was true, he was
arrested.  The case was subsequently dismissed.  The defendant
did not tell me anything about the arrest.  I called him a few
days later and said, you got arrested.  Why didn't you call me?
I lost your number.  I said, that doesn't fly with me.  You
come to my office on Monday and you tell me that you lost my

G4decapc

1    number and you got arrested.

2            So he came to my office on Tuesday.  Tested him.  He

3    was negative.  He's doing okay.  He's living with mom.  Not

4    crazy about it.  He's working.  He's not using drugs.  But he

5    was arrested.

6            So does a condition of electronic monitoring whereby

7    he stays home, curfew with electronic monitoring, make sense?

8    Yes.  Because he would be home and not out in the street at

9    12:00 at night, doing God knows what, in a cab with a knife.

10   But does the Court need to impose that?  It's up to your Honor.

11   I think he could be home at night.  We could monitor that.

12           THE COURT:  He works during the day, I take it?

13           OFFICER:  During the day, basically 20 hours, possibly

14   a little bit more.  So it's not something he needs to be out of

15   his home basically after 5:00 or 6:00.  If he was placed on

16   electronic monitoring, not home incarceration, but a curfew of

17   some type, so that he has to be home from a period of time,

18   that's helpful, because we know he's not roaming the streets,

19   getting into trouble.

20           MR. TOUGER:  Your Honor, my compromise was going to be

21   exactly that:  That the Court set a curfew -- let's say 8:30 at

22   night; that he has to be home at 8:30.  I think that's a --

23           THE COURT:  Officer Ramirez, I was going to ask you

24   for a suggestion on a curfew.

25           OFFICER:  I think a curfew -- leaving the house early

G4decapc

1   in the morning, whereby the officer who would be supervising

2   him -- wouldn't be me; would be someone who does curfew -- on

3   electronic monitoring would adjust his schedule to allow him to

4   leave early enough -- and I understand it's only a half hour,

5   an hour from his home to his program -- I would guess somewhere

6   around 8:00 in the morning or 7:30 in the morning he would

7   leave, and then hopefully be home at a reasonable time; around

8   5:00 or 6:00.  I think that is something that we can do at

9   pretrial.  We can put a monitor on him.

10          It would not be onerous expense-wise for us to do

11   that.  So we can afford to do that.  And I think it's

12   productive in that we'd know where he was.

13          And also, so that your Honor is aware, as your Honor

14   just heard, he's doing really well.  I don't know that locking

15   him up was the way to go, and that's what I shared with the

16   government.  So I thought as a compromise, an electronic

17   monitoring with a curfew would possibly address their concerns.

18          MR. TOUGER:  Your Honor, I would just suggest a later

19   curfew.  I think that would be more efficient.

20          THE COURT:  Why?

21          MR. TOUGER:  Because of his home --

22          THE COURT:  He's working 20 hours a week.

23          MR. TOUGER:  Not necessarily because of work, your

24   Honor.  It's more because of his home environment.  It would be

25   better if he -- there is just --

G4decapc

1          THE COURT:  You start making that argument about the

2     home environment, you may not want to go that way.

3          MR. TOUGER:  He's coping with that, your Honor.

4          So I would just ask that he have time to get something

5     to eat before he comes home.  I would suggest if 8:30 is too

6     late for the court, 7:30 is something you may consider.

7          THE COURT:  Ms. Lonergan, anything further from the

8     government?

9          MS. LONERGAN:  I think everything's been adequately

10    shared.  I don't see a reason for a curfew that's much later

11    than he would get home from work.

12         THE COURT:  All right.  Mr. Christopher, do you want

13    to stand, sir?

14         Mr. Christopher, I'm going to modify the conditions of

15    your pretrial release, all right?  I'm going to impose

16    electronic monitoring on you, to be arranged by pretrial.  And

17    you're going to be subject to a curfew.  Your pretrial officer

18    will fix the precise time in the morning that you'll be

19    permitted to leave to go to your employment.  And I'm going to

20    require you to be back in the apartment by 6:00 p.m.

21         Do you understand, sir?

22         DEFENDANT CHRISTOPHER:  Yes.

23         THE COURT:  And do you understand that if you test

24    positive for any opiates or marijuana or anything else, or you

25    have any other run-ins with law enforcement, that you're going

G4decapc

1    to be back before me, and that your liberty is going to be in

2    jeopardy?

3              DEFENDANT CHRISTOPHER:  Yes.

4              THE COURT:  Because I won't hesitate, if you don't

5    live up to your commitments, to remand you so that I know where

6    you are.  All right?

7              You understand all that?

8              DEFENDANT CHRISTOPHER:  Yes.

9              THE COURT:  Very well.

10             MR. TOUGER:  Could I have a moment to speak with my

11   client?

12             THE COURT:  Yes.

13             Anything further?

14             MS. LONERGAN:  Not from the government, your Honor.

15             THE COURT:  Anything further from any of the

16   defendants?

17             MR. PATEL:  I think not, your Honor.

18             MR. DUNN:  No, your Honor.

19             THE COURT:  Mr. Touger, I'm going to just ask you to

20   take a seat for a moment, if you would.  Everyone is to remain

21   seated while the defendants are escorted from the courtroom.

22             Have a good afternoon.

23             (Adjourned)

24

25