*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 8, 2022

**BY ECF**

The Honorable John P. Cronan
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    **United States v. James Capers**,
              S5 15 Cr. 607 (JPC)

Dear Judge Cronan:

      The Government submits this letter in connection with the re-sentencing of defendant James Capers, a/k/a "Mitch," currently scheduled for Thursday, September 15 at 4:00 pm. In 2015, Capers shot and killed Allen McQueen while McQueen was walking down the street holding his young daughter in his arms. A jury convicted McQueen of racketeering conspiracy and specifically found that the pattern of racketeering activity that Capers agreed to commit involved both the murder of Allen McQueen and the distribution of large amounts of crack cocaine. Capers was also convicted of participating in a narcotics conspiracy, and the murder of McQueen through the use of a firearm. Following an intervening change in the law, the Second Circuit vacated the murder through use of a firearm conviction and remanded the case for re-sentencing. Recognizing that Judge Pauley originally sentenced McQueen to 42 years' imprisonment, the Government respectfully continues to submit that a Guidelines sentence of life imprisonment is appropriate for Capers's participation in a racketeering conspiracy that included his personal participation in the brutal and senseless murder of Allen McQueen.

## Background

### A. The Indictment

      On October 24, 2016, a grand jury sitting in this District returned Indictment S5 15 Cr. 607 (the "Indictment") charging Capers with various racketeering, narcotics, and firearms offenses. Specifically, Capers was charged with one count of racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d) (Count One); one count of murder in aid of racketeering, in violation of Title 18, United States Code, Section 1959(a)(1) (Count Two); one count of conspiracy to distribute and possess with intent to distribute 280 grams and more of cocaine base, commonly referred to as "crack," and substances including marijuana, in violation of Title 21,

1

United States Code, Section 846 (Count Three); one count of murder in connection with drug trafficking, in violation of Title 21, United States Code, Section 848(e) (Count Four); one count of murder with a firearm, in violation of Title 18, United States Code, Section 924(j); and one count of use, carrying, and possession of a firearm during and in relation to a crime of violence and/or drug trafficking crime, in violation of Title 18, United States Code, Section 924(c) (Count Six).  (Presentence Report ("PSR") ¶¶ 1-7).[1]

On November 28, 2016, Capers proceeded to trial before this Court and a jury.  The evidence at trial established the following facts about a street gang in the Bronx called the Leland Avenue Crew, the defendant's participation in the Crew, and the acts of violence and sales of narcotics committed by the defendant as a member of the Crew.

### B. The Leland Avenue Crew

From in or about 2007 through in or about September 2015, the Leland Avenue Crew and its rival, the Taylor Avenue Crew, controlled the distribution of crack cocaine in and around Leland Avenue and Taylor Avenue, two parallel streets in the Bronx separated by one block.  (PSR ¶ 25).  Members and associates of the crew that distributed crack on Taylor Avenue referred to themselves as "Taylor" and the "Bugatti Boys."  (*Id.*)  Members and associates of the Leland Avenue Crew, which distributed crack on Leland Avenue, referred to themselves as "Leland" and the "Paper Gang."  (*Id.*)  Each of the two gangs prohibited and prevented outsiders and rival narcotics dealers from distributing narcotics within the areas that they respectively controlled.  (*Id.*)

Members and associates of the two gangs explicitly acknowledged their respective group affiliations by, among other things, creating and placing on social media sites such as Facebook and YouTube photographs and rap videos that celebrate the two gangs' illegal activities and cast scorn on rival gangs.  (PSR ¶ 26).

### C. The Leland Avenue Crew's Drug Distribution

Both the Leland Avenue Crew and the Taylor Avenue Crew distributed at least 280 grams of crack during the relevant time period, but the amount of crack sold was significantly higher.  (PSR ¶ 27).  Members of the Leland Avenue Crew sold crack consistently on a daily basis from 2009 to 2015.  (PSR ¶ 30).  On average, the Crew made over 30 individual crack sales on any given day.  (*Id.*).  Assuming, conservatively, that each sale was only a single $10 bag and thus that the members of the Leland Avenue Crew were responsible for the sale of 3 grams of crack per day, the members of the Crew were responsible for the distribution of at least 6.5 kilograms of crack over the charged period.  (*Id.*).

The defendant was an active participant in the Crew's drug distribution.  Capers began associating with the Leland Avenue Crew in at least 2009 and began working with other members to sell crack cocaine.  (PSR ¶ 28).  In or around 2011, Pablo Beard became the head of the Leland Avenue Crew, and Capers became his "right-hand man."  (PSR ¶ 29).  Beard and Capers continued

---

[1] On March 3, 2016, the Government filed a prior felony information against Capers, pursuant to Title 21, United States Code, Sections 841(b)(1)(A) and 851.  (PSR ¶ 9).

to sell crack along with other members of the Crew. (*Id.*) Around this time, the gang's members began referring to themselves also as "Paper Ave.," a name that was meant to convey how much money they were making selling drugs. (*Id.*)

In addition, Capers worked to protect the Crew's crack distribution operation and territory. On one occasion in March 2009, Capers and fellow Crew-member Anthony Moye disrupted an attempt by an undercover police officer to buy crack in Leland Crew territory. (PSR ¶ 28). After warning the crack seller that the buyer was an officer, Capers and Moye followed the officer and ordered him to get off the block. Capers told the officer to get off the block, "before you get hurt." (*Id.*).

### D. The Leland Avenue Crew's Acts of Violence

The proximity between Taylor Avenue and Leland Avenue contributed to a violent rivalry between the two groups, which competed for the business of crack customers in the area. (PSR ¶ 31). In or about 2011, the rivalry between the crews became particularly heated following an attempt by Taylor Crew member Justin Rivera to rob Leland Crew member Jessie Irvin at gunpoint. (*Id.*) A large fight broke out between members of the Taylor Avenue Crew and members of the Leland Avenue Crew and, although the fight ultimately dissipated, in the months and years that followed, the animosity between the two crews did not. (*Id.*)

The acts of violence committed by members of the Taylor Avenue Crew and members of the Leland Avenue crew included multiple shootings that would constitute attempted murder under New York law. (PSR ¶ 32). Of particular significance, on or about November 19, 2014, Eric Marcano, a/k/a "Trouble," was shot outside of 1526 Beach Avenue. (*Id.*) Marcano, who is an associate of the Taylor Avenue Crew, was shot in the left rear shoulder, left rib cage area, left lower back, and left upper chest. (*Id.*) The shooting left Marcano paralyzed. (*Id.*) In part to retaliate for the shooting of Marcano, on March 3, 2015, Elijah Davila, who is Marcano's brother and a member of the Taylor Avenue Crew, shot and killed leading Leland Avenue Crew member Pablo Beard in front of 1512 Leland Avenue. (*Id.*) Allen McQueen, another member of the Taylor Avenue Crew, was also involved in the shooting. (*Id.*)

In addition to committing acts of violence targeting rival gangs, members of the Leland Avenue Crew committed acts of violence targeting civilians who were unaffiliated with any gang. (PSR ¶ 35). The acts of violence, which consisted primarily of robberies, enhanced the violent reputation of the Leland Avenue Crew and enriched the crew's members. (*Id.*) Capers committed several of these robberies with other members of the crew. For example, in or about 2008 or 2009, Capers and fellow Crew-member Jessie Irvin committed multiple robberies of cellphones from innocent people walking the streets. (*Id.*) And, on May 21, 2015, just two months after being released from prison, Capers and fellow Crew-member Edwin Moye robbed a resident of the Parkchester Apartments, taking his cellphone and a small amount of cash. (*Id.*) Marquise Rochester, another member of the Leland Avenue Crew, was also present. (*Id.*) During the robbery, Capers grabbed the victim's cellphone and later yelled at the victim and jumped at him in a way that caused the victim to fear for his safety. (*Id.*)

### E. The Murder of Allen McQueen

Following the murder of Pablo Beard, members of the Leland Avenue Crew felt soft and vulnerable. (PSR ¶ 33). The Crew worried that their rivals in the Taylor Avenue Crew might view them as weak because they had allowed Beard to be killed. (*Id.*) They also worried that rival gang members would attempt to take advantage of this perceived weakness. (*Id.*) So they plotted their revenge, and specifically discussed the fact that they needed to respond with violence and that the Taylor Crew could not be allowed to get away unscathed after murdering the leader of the Leland Crew. (*Id.*)

Revenge came on July 7, 2015. That day, Capers was selling marijuana on Leland Avenue when he recruited one of his customers, Carlos Ruiz, to give him a ride. (PSR ¶ 34). Capers told Ruiz he needed the ride to pick up additional drugs, but in reality, Capers had something else in mind. (*Id.*) As Ruiz drove Capers out of the neighborhood, Capers instructed Ruiz to drive up and down Taylor Avenue, a block that Capers otherwise could not walk on safely. (*Id.*) While on Taylor Avenue, they repeatedly drove past Allen McQueen, who was walking on the block holding his one-year old daughter in his arms. (*Id.*) After several passes, Capers told Ruiz to pull over so he could go talk to McQueen, whom Capers claimed was his drug supplier. (*Id.*) Capers then got out of the vehicle, drew his gun, and ran down the street after McQueen. (*Id.*) When he got close, Capers fired several shots at McQueen. (*Id.*) One of the bullets struck McQueen in his left side, pierced his lung, and struck a large vein feeding into the heart. (*Id.*) As Capers fled the scene, McQueen tried to run north on Taylor Avenue, still clutching his daughter, before he eventually collapsed and died on the street. (*Id.*) McQueen's daughter suffered a bump on the head, but, fortunately, suffered no additional physical injuries. (*Id.*)

### F. The Jury's Verdict

On December 7, 2016, the jury found Capers guilty of Count One (racketeering conspiracy); Count Three (narcotics conspiracy), and Count Five (murder through use of a firearm). With respect to Count One, the jury specifically found that the pattern of racketeering activity that Capers agreed to commit included the murder of Allen McQueen. The jury found Capers not guilty on Count Two (murder in aid of racketeering); Count Four (murder in connection with drug trafficking); and Count Six (firearms offense).

### G. The Original Sentencing

On June 2, 2017, Capers was sentenced by Judge Pauley. At the outset of the proceedings, Capers admitted to the open violation of supervised release specification charging him with intentional murder under New York State law. (Sent. Tr. at 3). Judge Pauley then heard victim impact statements from several of McQueen's family members who described the immeasurable loss they suffered when Capers murdered McQueen.[2] (*Id.* at 5-11). For example, McQueen's sister, Yasmine Linton, told the Court about the pain caused by the death of her brother and her wish that Capers spend the rest of his life in prison:

---

[2] The Government is submitting under seal the victim impact letters that were originally submitted to Judge Pauley.

4

> My family and myself are heartbroken because you [Capers] decided to take his life. My heart aches every day knowing that he is no longer here knowing that his daughter doesn't have a father. . . I cry every day. I'm screaming inside because it is unbearable. I try not to cry, but the feeling of losing a loved one is indescribable. I just want my brother back. That's all. Why did you have to kill him? I can't stomach the fact that Allen is gone, but he is gone, and he's not coming back because of you. I never wish death on anyone, but I wish you never walk on the streets out the gates a free man. You didn't care that my brother held his daughter in his arms. Can you imagine running for your life while holding your child? The amount of fear he had.

(*Id.* at 5-6).  McQueen's stepdad, Woodrow Hines, similarly explained how he misses his son, the pain of seeing McQueen's daughter grow up without her dad, and his hope that Capers spend his life in prison:

> I see him everywhere in our house because his pictures are all over the place. We don't hear his voice, his laughter, his smile. Every time I look in his daughter's face, we see him because she looks exactly like him. Now she has to grow up in life calling somebody else daddy. Why? Because James Capers has taken him from us. Also, your Honor, don't give this heartless person a chance to ever do this to any other family. Don't let him walk the streets any more, please.

(*Id.* at 10).  Finally, Bobbi Davis, the mother of McQueen's daughter, spoke to the Court about McQueen's joy at becoming a father and the pain of his daughter growing up without him, before she became too emotional to continue:

> And I remember when I got pregnant how happy he was. He was so happy to be a father. And then I remember I told him to keep a secret, and like two days later his mom was calling me with the news already. He was just so happy to be a father. And now my daughter has to grow up without her father. And when Allen died, Taylor was a baby. She wasn't talking. She couldn't walk. She couldn't do anything. And now she's going on three. She is talking, she's walking, she knows her A, B, C's. She is so smart, and Allen, he would -- he missed all of that, and -- and -- I can't do it. I'm sorry, I can't do this.

(*Id.* at 11).  After hearing from the parties and Capers, Judge Pauley sentenced Capers to a total of 42 years' imprisonment, consisting of 37 years on Counts One and Three and five years on Count Five, as well as 18 months of imprisonment on the supervised release violation to run concurrent with the terms of imprisonment imposed on Counts One and Three.

5

### H. The Appeal

On appeal, Capers challenged his convictions by arguing that (i) there was insufficient evidence to support the jury's findings that the murder of Allen McQueen was in furtherance of the racketeering enterprise and the narcotics conspiracy, and (ii) the district court erred in failing to instruct the jury that it must find that Capers committed premeditated murder to convict him under § 924(j). Following the Supreme Court's decision in *United States v. Davis*, Capers filed a supplemental brief arguing that the § 924(j) conviction must be vacated because the district court's instruction that racketeering conspiracy is a crime of violence was plainly erroneous.

On December 14, 2021, the Second Circuit vacated the § 924(j) conviction in light of *Davis*. *See United States v. Capers*, 20 F.4th 105 (2d Cir. 2021). The Second Circuit affirmed Capers's conviction in all other respects, including holding that there was sufficient evidence that the murder of Allen McQueen was in furtherance of both the racketeering conspiracy and the narcotics conspiracy. *Id.* at 113-15. The Second Circuit remanded the case with authorization to this Court in its discretion to vacate the sentences and resentence the defendant on all counts due to the elimination of the sentence on Count Five.

### The Presentence Report

In the PSR, the Probation Office calculated the Guidelines range on Counts One and Three to be life imprisonment, with a mandatory minimum of twenty years' imprisonment.

### A. Offense Level

The Probation Office calculated the offense level as follows. Pursuant to U.S.S.G. § 2E1.1, Application Note 1, Probation found that the murder of Allen McQueen and the narcotics conspiracy were separate harms within the racketeering conspiracy and therefore constituted different groups, for which an offense level must be determined. (PSR ¶¶ 54-56). With respect to the murder of Allen McQueen (Group 1), Probation found that, pursuant to U.S.S.G. §§ 2E1.1(a)(2) and 2A1.1(a), the base offense level is 43. (PSR ¶ 57). With respect to the narcotics conspiracy (Group 2), Probation found that, pursuant to U.S.S.G. §§ 2E1.1(a)(2) and 2D1.1(c)(3), the base offense level is 34.[3] (PSR ¶ 63). Pursuant to U.S.S.G. § 2D1.1(b)(2), two levels are added because the defendant used violence in connection with the narcotics conspiracy. (PSR ¶ 64). Pursuant to U.S.S.G. 3D1.4, Groups 1 and 2 result in 1.5 units, and therefore, the combined adjusted offense level is 44. (PSR ¶¶ 69-72). However, pursuant to U.S.S.G. Chapter 5, Part A, comment n.2, the offense level is treated as 43 in the rare situation, such as this one, where the total offense level is calculated to be higher than 43. (PSR ¶ 75).

---

[3] Pursuant to U.S.S.G. § 3D1.2(d), Probation found that Count Three (narcotics conspiracy) grouped with the narcotics conspiracy group in Count One. (PSR ¶ 56).

B. **Criminal History**

In calculating Capers's criminal history, Probation found that Capers was a career offender, pursuant to U.S.S.G. § 4B1.1(b), and therefore in Criminal History Category VI. (PSR ¶ 98). The defendant's criminal history includes the following convictions:

- A May 2010 conviction for trespassing, which resulted in a sentence of 21 days in jail (PSR ¶ 80);

- A December 2010 conviction for criminal sale of a controlled substance on school grounds, which resulted in a sentence of one year of imprisonment (PSR ¶ 77);

- A December 2010 conviction for criminal sale of a controlled substance in the third degree, which resulted in a sentence of 18 months' imprisonment (PSR ¶ 82);

- A February 2011 conviction for attempted assault in the third degree, which resulted in a sentence of 30 days in jail (PSR ¶ 86); and

- An April 2013 conviction for being a convicted felon in possession of a firearm, which resulted in a sentence of 37 months' imprisonment (PSR ¶ 88).

The PSR also notes that Capers committed the instant offense while on federal supervised release. (PSR ¶ 96).

C. **Probation's Recommendation**

Ultimately, just as it had done in connection with Capers's original sentencing, Probation recommended a sentence of life imprisonment on Count One and Count Three.

**Discussion**

Regarding the Court's contemplated sentence, the Government submits that a Guidelines sentence of life imprisonment is appropriate for Capers.

Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). "Pursuant to the 'remedy opinion' [in *Booker*], the now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences." *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *see also Booker*, 543 U.S. at 261-62. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id*. at 596; *see also United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory

7

list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); *see also Fernandez*, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27; *see also Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (*quoting Rita v. United States*, 127 S. Ct. at 2464-65).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B) to afford adequate deterrence to criminal conduct;

   (C) to protect the public from further crimes of the defendant; and

   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

*A Sentence of Life Imprisonment is Appropriate*

In this case, a particularized consideration of the factors set forth in Section 3553(a) demonstrates that a sentence of life imprisonment is appropriate for Capers.

First, a sentence of life imprisonment would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The defendant was convicted of the most serious types of offenses. As the evidence at trial demonstrated, Capers was an active and central figure in the Leland Avenue Crew, a violent street gang that, for years, terrorized the residents of the Parkchester neighborhood through its non-stop drug dealing and its violent feud with its rivals from Taylor Avenue. From the very beginning of his time in the Crew, Capers worked with others to sell crack cocaine in the neighborhood. At trial, Jessie Irvin, a member of the Leland Avenue Crew, testified that Capers sold crack cocaine and marijuana on Leland Avenue, and Andrea Bell and Carlos Ruiz testified about how they purchased marijuana from Capers. The evidence at trial also showed numerous instances when Capers was arrested for selling crack cocaine or found in possession of crack cocaine during an arrest. When he returned from prison in 2015, Capers went right back to selling crack cocaine and marijuana on Leland Avenue. Drug dealing is an incredibly serious and dangerous offense. It victimizes the individuals who are addicted to these illegal substances, and it victimizes the innocent residents of the neighborhood, who, through no fault of their own, are exposed to the harmful effects that the drug trade brings to their community.

Drug dealing, however, was not the most serious offense that Capers committed as a member of the Leland Avenue Crew. He took another man's life in a calculated, brutal, and highly dangerous way. Capers shot and killed Allen McQueen in broad daylight, in the middle of a residential street, next to a park and a school. One of the bullets struck a car parked down the street. Surveillance video from the scene shows innocent bystanders running in all directions to escape the gunfire. None of this mattered to Capers. Not even the presence of McQueen's one-year old daughter could deter Capers from following through on his plan to kill McQueen. As he circled the block, Capers could see that McQueen had his daughter with him. He could have aborted his plan, knowing that this innocent child could easily be hit in the shooting or otherwise injured. Capers simply did not care. He wanted to send a message. As Judge Pauley observed at the original sentencing hearing, "the images of McQueen running and then collapsing on the sidewalk are burned into this Court's memory. You saw the opportunity to strike back and didn't care that a baby was in the kill zone. But for the grace of God, she survived. McQueen will never see his daughter grow up and his daughter will never know her father."[4] (Sent. Tr. at 25).

Second, a sentence of life imprisonment is needed to protect society from future crimes of the defendant, especially in light of Capers's particular circumstances. Throughout his life, the defendant has demonstrated that he is incapable of conforming his behavior to the law. As discussed above, by the age of 24 (when he was originally sentenced), the defendant was already a career offender who has had repeated contact with law enforcement and the criminal justice system, and, yet, it has not stopped him from engaging in the most serious of criminal conduct.

---

[4] A copy of the video referenced by Judge Pauley, which was GX 201-H at trial, is attached as Exhibit B.

Those crimes have included drug dealing, weapons possession, and robberies. In addition, Capers committed the instant offense just four months after being released from prison and while on federal supervised release from a federal firearms charge. As the PSR notes, Capers had at least eleven separate disciplinary incidents in jail between his arrest in this case and the date of his trial, including fighting with others and numerous failures to obey orders. (PSR ¶¶ 12-22). The PSR further notes that from the time of trial in December 2016 until November 2021, the defendant has had 17 additional disciplinary sanctions, including possessing a dangerous weapon on multiple occasions and fighting with others. (PSR ¶ 11). And the PSR also reflects that during his prior term of federal imprisonment, Capers was sanctioned nine times for eleven different rule infractions, including fighting with another person and possession of a dangerous weapon. (PSR ¶ 23). Rather than use his time in prison or pretrial detention to better himself and begin a path toward rehabilitation, the defendant has consistently flouted the rules.

In his sentencing submission, Capers seeks a sentence of 180 months—or 15 years—imprisonment. As an initial matter, Capers is facing a mandatory minimum sentence of 240 months' imprisonment, and therefore the sentence he seeks is not legally available. But more importantly, none of his arguments warrant this Court going any lower than the original sentence imposed, nor do they undermine the Government's position that life imprisonment is the appropriate sentence.

Capers continues to maintain the fiction that the murder of McQueen had nothing to do with Capers's participation in the Leland Avenue Crew. But the jury rejected this argument when it found that the Government proved that Capers committed the murder in connection with the racketeering conspiracy.[5] *See* Memorandum and Opinion Denying Defendants' Rule 29 Motion, at 3 (Dkt. No 202) ("Capers' argument rests on the misguided belief that murder committed 'in aid of racketeering' (Count Two) is the same as murder committed in connection with a racketeering conspiracy (Count One)."). Indeed, in affirming Capers's conviction on Count One, the Second Circuit held that the jury's finding was based on "extensive evidence that Capers was a member of the Leland Crew, that Leland and Taylor would commit violent acts against one another in order to maintain territory and respect, and that Capers both participated, before McQueen's murder, in group Leland Crew threats to avenge the murder of their leader, and wrote notes after McQueen's murder that a reasonable juror could find linked the murder of McQueen to the success of the Leland Crew." *See Capers*, 20 F.4th at 114. The Government also introduced "evidence that Capers's successful effort to hunt down and kill McQueen was intertwined with, and furthered, the Leland Crew's collective desire for revenge. Before the McQueen murder, other gang members expressed concern that the gang's interests demanded retaliation against Taylor for the killing of Beard," which demonstrated that "Capers's interest in revenge not only paralleled the gang's; there was evidence that he shared its collective goal." *Id.* Six years later, Capers still fails to truly accept responsibility for his actions, hoping the Court will show him sympathy for losing a friend instead of seeing him as the violent gang member that he is.

---

[5] Capers argues that the Court should not base his Guidelines on acquitted conduct. (Def. Ltr. at 5). This argument is meritless, because the jury found Capers guilty of Count One and found that the murder of McQueen was part of the racketeering conspiracy, a verdict that was affirmed on appeal.

10

Just as he did at his original sentencing hearing, Capers in his letter to the Court apologizes to McQueen's family. But the Court should view these apologies in the context of Capers's other post-trial actions; namely, his repeated boasting that he "beat the body," avoided a mandatory life sentence, and how he will be home much sooner than everyone else expected:

- February 4, 2017 Email: "THATSS A FACTT I FUCKINGG MISS U TOO BROO SHYT SAD I HAD TO GET BOOKED SMH i bee home soon *idk if you kno i went to trial and beat that bodyy and allatt broo*." (Ex. A at 2) (emphasis added);

- February 4, 2017 Email: "*should be home in the next 8-10* moree jointss if i get some good appeal play i probably be home sonnerr then niggas thought." (Ex. A at 1) (emphasis added);

- February 4, 2017 Email: "shytt chillen doing the things i like too doo cant wait to get up outta this spot *start thiss bid win these appeals and might be homee sonner then niggas think wooordd*." (Ex. A at 6) (emphasis added);

- February 5, 2017 Email: "*nahh hell no i went to trial over here in the feds i beat the man down* i still bleww i might get this 20 with like 6 time serve which gonna leave mee at 14 imaa do like 10 in ahh half when these new lawss drop ima in striaght out the door in likee 6-8 more joints type shyt." (Ex. A at 7) (emphasis added);

- February 17, 2017 Email: "ahh ahh ahh aston martin play brim fuck is poppin my guy i aint gonn lie bruhh i was thinking about youu *i hadd to hit you upp I dont know if you knoww but i beat that petey n allatt soo that means i be home again* broo factss i cant wait til my moment but other then thatt im just tryna get to itt !!!!" (Ex. A at 8) (emphasis added);

- February 19, 2017 Email: In response to an email asking if he "beat the case," Capers replied "and *yeah thats a fact beautiful thats a fuckinn fendii ya boy ahh be home sooner then niggas thought* ouuuuuuuuu ( young m.a voice ) lmaoo." (Ex. A at 9) (emphasis added);

- February 28, 2017 Email: "you make it sound like its forevaa lol 6 to 10 iss nothinn imaa still have my bop when i touch down 'physically' because these niggas aint built fit like mehh and 'mentally' strongg with a gentlement gangsta demeanor !! soo i aint stressingg *i made history i beat the fedss babiee factss* !!! when i touchdown ima get to that mini ME bagg" (Ex. A at 10) (emphasis added);

- February 28, 2017 Email: "how many timess i gotta tell you mamiii.... *i just told youu..........i beat lifeee soo im good....i be homee in a few moree*." (Ex. A at 11) (emphasis added);

11

- March 2, 2017 Email: After receiving an email from someone who heard that he "beat the main charge," Capers responded "*how yuu knew I beat that shyt* that shyt was on the newss r yu heard three the timelinee." (Ex. A at 12) (emphasis added).

Thus, Capers's apologies ring hollow because Capers has not really shown remorse for his actions; no remorse for the pain that he caused the family of Allen McQueen; no remorse for the trauma inflicted on a one-year old girl who is now growing up without a father, and who, someday, will learn the horrible truth about what happened to him while he held her in his arms. Indeed, as Judge Pauley observed:

> Your emails from jail boast about beating the government and avoiding a mandatory life sentence, telling your friends you'll be out sooner than anybody thought. Apparently, all of this amuses you. You think it's funny. Such sentiments as expressed in those emails may be just braggadocio or wishful thinking on your part, but they certainly do not suggest to this Court any remorse.

*See* Sent. Tr. at 25-26.

Similarly, Capers now claims that "seven years in prison did a lot for me" and "it opened my eyes, it made me see better." These words should carry little weight in the Court's decision, because in 2013, at sentencing for his federal firearms offense, Capers told the Judge Griesa virtually the same thing:

> I just want to say as I have been locked up for twelve months I seen people come and never leave. I realize the place is not for me. I realize I could be better than this, and that's what I'm going to do to show my morals when I go home, too.

*United States v. Capers*, 12 Cr. 293, Dkt No. 19 at 8. But Capers did not do better, and he did not live a life guided by what the rest of society accepts as moral. He returned to the Leland Avenue Crew, selling drugs, committing robbery, and finally, committing murder. (*See* Sent. Tr. at 26 ("You've said that you want to change your ways and be a productive member of society. Of course you said the same thing to Judge Griesa just a few years ago, and told him you were 'gonna show your morals' when you got home. You certainly did, but not in the way any judge would have understood what you intended.")). At his original sentencing, Judge Pauley remarked:

> You're a very dangerous person who needs to be imprisoned for a very long time. You're a threat to all law-abiding citizens. I really have no way of knowing when, if ever, you are going to put your violent impulses behind you. But I do know that the community at large needs to be protected from you."

(*Id.* at 26).  The defendant's continued possession of weapons and fighting while in prison for the last seven years answers the open question before Judge Pauley:  Capers has demonstrated that he continues to be someone who cannot abide by the rules of society.

At the end of their submission, defense counsel expresses their "hope" that they will one day receive a call from Capers, who will have been released from prison and working and living with his family.  (Def. Lt. at 9).  The record before the Court, however, shows that there is nothing to support this "hope."  James Capers has demonstrated time and again that he is a danger to the community, an individual who has chosen a life of crime, with no remorse for his actions.  His promises in the past to change his life were empty.  His convictions in this case have left him unchanged.  A Guidelines sentence of life imprisonment will ensure that Capers is not given yet another opportunity to return to the streets to further harm society.

## Conclusion

For the foregoing reasons and those set forth in the Government's original sentencing submission, the Government submits that a sentence of life imprisonment is warranted to serve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____
Scott Hartman
Jason M. Swergold
Assistant United States Attorneys
Southern District of New York
(212) 637-2357
(914) 993-1963

cc:    Andrew G. Patel, Esq.,
       Ben Silverman, Esq.